AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

> **FILED**
> CLERK, U.S. DISTRICT COURT
> 11/27/2024
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _____ VV _____ DEPUTY

| | |
|---|---|
| United States of America<br>v.<br><br>MIHAI TRIF,<br><br>Defendant(s) | Case No.  **2:24-mj-07136-DUTY** |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1343, 1349, 1028A | Conspiracy to Commit Wire Fraud, Aggravated Identity Theft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s *Jenae Combest-Smith*
_____
*Complainant's signature*

Jenae Combest-Smith, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    11/27/2024
_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

<u>Count One, 18 U.S.C. § 1349</u>

Beginning in or before 2022, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendant MIHAI TRIF, and others, conspired to commit wire fraud, in violation of Title 18, United States Code, Section 1343. Defendant and his co-conspirators collected images of expensive vehicles and advertised them for sale online to induce victims to wire them the purchase price of the vehicles. When the victims realized that defendant had stolen their purchase money and had no vehicles to deliver, defendant would abandon the fake identity with which he committed the fraud and assume a new one, often moving in the process and casting aside the prepaid cellular telephone he used in the scheme. Defendant would also use counterfeit debit cards obtained from his co-conspirators to withdraw funds from victims' accounts at ATMs. Defendant and his co-conspirators used interstate wires to defraud their victims throughout this conspiracy.

<u>Count Two, 18 U.S.C. § 1028A</u>

Beginning in or before 2022, and continuing through the present, in Los Angeles County, within the Central District of California, and elsewhere, defendant MIHAI TRIF knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire and Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

1

<u>**AFFIDAVIT**</u>

2      I, Jenae Combest-Smith being duly sworn, declare and state as

3 follows:

4              I.    **PURPOSE OF AFFIDAVIT: COMPLAINT**

5      1.    This affidavit is made in support of a complaint against

6 MIHAI TRIF for conspiracy to commit wire fraud, and aggravated

7 identity theft, in violation of Title 18 U.S.C. §§ 1343, 1349, and

8 1028A.

9      **Incorporated Search Warrant Affidavit**

10     2.    On November 27, 2024, the Honorable Margo A. Rocconi,

11 United States Magistrate Judge, issued search warrants in cases 2:24-

12 MJ-7119 and 2:24-MJ-7120 for the vehicle and residence of TRIF based

13 on the attached affidavit, which is incorporated by reference.

14     **TRIF's Statements**

15     3.    On November 27, 2024, law enforcement officers conducted a

16 traffic stop on TRIF who was driving the SUBJECT VEHICLE out of the

17 parking area for the SUBJECT RESIDENCE.  TRIF presented a fictitious

18 Canadian ID with the name Ivan BUGATZI. Agents interviewed Mihai

19 TRIF, who was read his Miranda rights and agreed to speak to agents.

20 TRIF was aware he was being recorded and admitted he was MIHAI TRIF,

21 not BUGATZI as listed on his ID.  TRIF denied details on how he

22 entered the United States and was not forthcoming about how long he

23 has been in the United States.  TRIF admitted to using counterfeit

24 debit cards to withdraw money from other persons' accounts at ATMs,

25 but claimed that he acquired these cards through an illegal website,

26 and did not know who supplied them.  He claimed that unknown

27 individuals coordinated with TRIF and advised him of random pick up

28

spots to obtain the cards. After he cashed out the cards, he claimed he took 90% of the cash to another drop location, keeping only 10% for himself.  TRIF denied being involved in any other scams or illegal activities. TRIF denied using multiple fictitious identities and having multiple bank accounts. TRIF refused to provide the passcodes for the many cellular telephones agents recovered, discussed below.  He also declined to consent to any search.  TRIF stated that he was planning to return to Romania in December.  TRIF said he learned via the internet to dispose of cellular telephones he used in fraud and related emails.  TRIF stated that he communicated with other criminals via email and Telegram, an encrypted communications application that has historically been hostile to law enforcement.  Ultimately, TRIF invoked his rights and the interview was terminated.

**Execution of the Search Warrants**

4.   On November 27, 2024, I and other law enforcement officers began to execute both search warrants.  Notable items seen in the SUBJECT VEHICLE included approximately $15,900 in cash. Multiple fictitious identification documents and bank cards were located inside the vehicle and concealed under various seats. Some of the cards and identifications had the name Karel TOKAR and Ivan BUGATZI on them, which are referenced in the incorporated affidavit.  Four cell phones were located inside the vehicle.

5.   Law enforcement officers noted the following in the SUBJECT RESIDENCE:  at least five cellular telephones, a laptop, about $52,000 in cash, bank statements in other persons' names often annotated with user names and passwords, one skimming device, many

luxury goods often with receipts, a Patek Phillipe and a Rolex watch, about 10 credit and debit cards in different names, two Czech Republic passports in different names but bearing TRIF's photograph, TRIF's genuine debit card and Romanian passport in his true name, and unknown drug residue consistent with personal use.

## II. CONCLUSION

6.    Based upon the foregoing facts and my training and experience, I believe there is probable cause to believe that TRIF conspired to commit wire fraud, and committed aggravated identity theft, in violation of 18 United States Code, Sections 1343, 1349 and 1028A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __27__ day of November, 2024.

_____
UNITED STATES MAGISTRATE JUDGE
MARGO A. ROCCONI

## AFFIDAVIT

I, Jenae Combest-Smith being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT: COMPLAINT

1.   This affidavit is made in support of a complaint against MIHAI TRIF for conspiracy to commit wire fraud, and aggravated identity theft, in violation of Title 18 U.S.C. §§ 1343, 1349, and 1028A.

**Incorporated Search Warrant Affidavit**

2.   On November 27, 2024, the Honorable Margo A. Rocconi, United States Magistrate Judge, issued search warrants in cases 2:24-MJ-7119 and 2:24-MJ-7120 for the vehicle and residence of TRIF based on the attached affidavit, which is incorporated by reference.

**TRIF's Statements**

3.   On November 27, 2024, law enforcement officers conducted a traffic stop on TRIF who was driving the SUBJECT VEHICLE out of the parking area for the SUBJECT RESIDENCE.  TRIF presented a fictitious Canadian ID with the name Ivan BUGATZI. Agents interviewed Mihai TRIF, who was read his Miranda rights and agreed to speak to agents. TRIF was aware he was being recorded and admitted he was MIHAI TRIF, not BUGATZI as listed on his ID.  TRIF denied details on how he entered the United States and was not forthcoming about how long he has been in the United States.  TRIF admitted to using counterfeit debit cards to withdraw money from other persons' accounts at ATMs, but claimed that he acquired these cards through an illegal website, and did not know who supplied them.  He claimed that unknown individuals coordinated with TRIF and advised him of random pick up

spots to obtain the cards. After he cashed out the cards, he claimed he took 90% of the cash to another drop location, keeping only 10% for himself.  TRIF denied being involved in any other scams or illegal activities. TRIF denied using multiple fictitious identities and having multiple bank accounts. TRIF refused to provide the passcodes for the many cellular telephones agents recovered, discussed below.  He also declined to consent to any search.  TRIF stated that he was planning to return to Romania in December.  TRIF said he learned via the internet to dispose of cellular telephones he used in fraud and related emails.  TRIF stated that he communicated with other criminals via email and Telegram, an encrypted communications application that has historically been hostile to law enforcement.  Ultimately, TRIF invoked his rights and the interview was terminated.

**Execution of the Search Warrants**

4.    On November 27, 2024, I and other law enforcement officers began to execute both search warrants.  Notable items seen in the SUBJECT VEHICLE included approximately $15,900 in cash. Multiple fictitious identification documents and bank cards were located inside the vehicle and concealed under various seats. Some of the cards and identifications had the name Karel TOKAR and Ivan BUGATZI on them, which are referenced in the incorporated affidavit.  Four cell phones were located inside the vehicle.

5.    Law enforcement officers noted the following in the SUBJECT RESIDENCE:  at least five cellular telephones, a laptop, about $52,000 in cash, bank statements in other persons' names often annotated with user names and passwords, one skimming device, many

2

luxury goods often with receipts, a Patek Phillipe and a Rolex watch, about 10 credit and debit cards in different names, two Czech Republic passports in different names but bearing TRIF's photograph, TRIF's genuine debit card and Romanian passport in his true name, and unknown drug residue consistent with personal use.

## II. CONCLUSION

6.    Based upon the foregoing facts and my training and experience, I believe there is probable cause to believe that TRIF conspired to commit wire fraud, and committed aggravated identity theft, in violation of 18 United States Code, Sections 1343, 1349 and 1028A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __27__ day of November, 2024.

_____
UNITED STATES MAGISTRATE JUDGE
 MARGO A. ROCCONI

3

**AFFIDAVIT**

I, Jenae Combest-Smith being duly sworn, declare and state as follows:

**INTRODUCTION**

1.   I am a Special Agent with Homeland Security Investigations ("HSI") in Los Angeles, California, and have been so employed since May 2022.  To become an HSI Special Agent, I completed six months of training at the Federal Law Enforcement Training Center in Brunswick, Georgia.

2.   During my employment as an HSI Special Agent, I have participated in investigations related to narcotics smuggling, organized criminal activity, document fraud, sex trafficking, human smuggling, and other financial related crimes. I have participated in various aspects of criminal investigations, including telephone records analysis, physical surveillance, search warrants, seizures of narcotics, electronics, documents, skimming devices, and reviewing evidence from those seizures.  I have also spoken to and interacted with many law enforcement agents who have prior knowledge and experience investigating financial related crimes and the methods used to commit those crimes.

3.   Prior to becoming a Special Agent with HSI, I was employed as an insurance fraud investigator for approximately 12 years in the private sector.  During my employment as an insurance fraud investigator, I investigated fraudulent insurance claims and was responsible for reporting fraudulent claims to designated government and law enforcement agencies for further investigation and prosecution

1    4.   I also have extensive experience investigating Romanian

2    Transnational Criminal Organizations (TCO). I have conducted

3    investigations in the Los Angeles area related to various fraud

4    crimes and money laundering, and I have also traveled to Romania to

5    share information and coordinate investigations with HSI Bucharest

6    and Romanian law enforcement regarding Romanians who travel from

7    Romania and Europe to the United States to defraud victims.

8                    I.   **PURPOSE OF AFFIDAVIT: SEARCH WARRANTS**

9    5.   This affidavit is made in support of search warrants for

10   the residence and vehicle of MIHAI TRIF for evidence of conspiracy to

11   commit mail, wire, and bank fraud, money laundering, and passport

12   fraud, in violation of Title 18 U.S.C. §§ 1341, 1343, 1344, 1349,

13   1956, and 1546 (collectively, the "SUBJECT OFFENSES"), as described

14   in Attachment B.

15   6.   The information set forth in this affidavit is based upon

16   my participation in the investigation, encompassing my personal

17   knowledge, observations and experience, as well as information

18   obtained through my review of evidence, investigative reports, and

19   information provided by others, including other law enforcement

20   partners. As this affidavit is being submitted for the limited

21   purpose of securing the requested warrants, I have not included each

22   and every fact known to me concerning this investigation. I have set

23   forth only the facts that I believe are necessary to establish

24   probable cause for the requested warrants.

25                 II.   **PREMISES AND VEHICLE TO BE SEARCHED**

26   7.   The premises and vehicle to be searched are:

27

28

                                    2

a)   The residence located at 4827 RIVERTON AVENUE, NORTH HOLLYWOOD, CALIFORNIA 91601 (the "**SUBJECT RESIDENCE**"), described more fully in Attachment A-1, which is incorporated by reference.

b)   The BLACK 2024 LAND ROVER RANGE ROVER SPORT P400 BEARING California license plate 9MNG093, VIN SAL1L9FU5RA404809, registered to EAN Holdings, and driven by MIHAI TRIF ("**SUBJECT VEHICLE**"), described more fully in Attachment A-2, which is incorporated by reference.

III.   **ADDITIONAL INFORMATION ABOUT FINANCIAL FRAUD**

8.   I have conducted financial investigations involving sophisticated money laundering techniques and fraud. Through training and experience, I have become familiar with how those engaged in fraudulent activity obtain identifying information of victims, such as a full name, date of birth and social security number, and then use that information to open numerous bank and credit card accounts. I know that individuals that commit fraud maintain victim information and other information relevant to the fraud scheme for long periods of time because it is of value in perpetuating additional acts or further fraud schemes. The purpose of opening accounts (i.e., bank, email, phone, etc.) is to further a fraud scheme, which often involves several co-conspirators. The goal of this scheme is to defraud banks, merchants, and victims to obtain cash or other items of monetary value such as gift cards and electronics. These items are often sought out due to their high liquidity. During account openings, those individuals committing fraud typically provide fictitious and/or fraudulent identities and a mailing address that

1   they exercise control over to obtain a bank issued debit or credit

2   card in furtherance of the fraud scheme, often using post mailboxes

3   or third-party mail receipt services to elude detection by law

4   enforcement. Due to the complexity of the fraud, the sheer number of

5   victims, and criminal conduct spanning multiple jurisdictions, it is

6   not uncommon for these financial fraud crimes go unsolved and/or

7   uninvestigated. This scheme requires the perpetrators to be in

8   communication, which is often done via cell phone(s) and/or VoIP

9   phones. Additionally, those involved in fraudulent acts and schemes

10  generally use a computer to facilitate the scheme by setting up email

11  accounts, setting up VoIP accounts, applying for bank accounts and

12  credit cards online, or other necessary things to make the scheme

13  successful, such as manufacturing counterfeit identification

14  documents, altered and/or counterfeit checks, credit cards, or other

15  financial instruments.

16  IV.  **ADDITIONAL INFORMATION ABOUT ROMANIAN TRANSNATIONAL CRIMINAL**

17  **ORGANIZATIONS (TCO)**

18      9.   Members of Romanian TCOs are trained to travel from Romania

19  and Europe to the United States to defraud Americans, United States

20  government programs, and the United States banking system. Members of

21  Romanian TCOs often stay in the United States illegally for many

22  years while they commit these crimes. Oftentimes, members travel back

23  and forth from the United States but re-enter and exit illegally in

24  order to evade law enforcement. Members are trained to import

25  fraudulent identification documents to assist them with their crimes

26  and launder money for the TCO with the goal to re-integrate it into

27  the Romanian banking system and real estate. This has been

28

corroborated by intelligence received from Romanian law enforcement along with my training and experience on Romanian TCOs.

10. Members of Romanian TCO fraud groups typically enter the country either legally with a visa, if they have no criminal record and can pose as a legitimate tourist or businessperson, or through established immigrant-smuggling rings in Mexico and Canada otherwise. Oftentimes the crew members maintain false identity documents, which they use if arrested to make it harder to identify them. Some maintain false passports so that they can abscond if granted bail and flee the country.

11. Members of Romanian TCO fraud groups have various ways of handling the proceeds of their offenses. Some is kept in cash for routine expenses. Some is usually deposited into a local bank account to pay for items for which cash would raise suspicion, such as rental cars and housing. The bulk, however, is sent abroad either to their co-conspirators or home countries. This may be as simple as sending cash hidden among other items abroad through carriers such as DHL, or transfers through banks, Hawalas, Western Union, or similar services. More recently, the trend has been to purchase cryptocurrencies for cash.

12. Members of Romanian TCOs involved in fraud schemes must keep evidence of their schemes, such as contact information for their co-conspirators, lists of victim information and accounts used in the scheme, simply to keep the scheme going. Much of this evidence is now stored on digital devices such as computers and smartphones.

13. Generally, perpetrators of fraud and identity theft schemes maintain this evidence where is close at hand and safe, such as in

1    their residences, automobiles, and, especially with smartphones, on

2    their person.  For larger or more sophisticated frauds, participants

3    often attempt to distance themselves from some of the incriminating

4    evidence by renting public storage units or safety deposit boxes

5    where they often keep the items they will not need immediate access

6    to.

7        14.  Members of Romanian TCOs must out of necessity communicate

8    with one another.  Commonly this is done by text, VOIP, email,

9    telephone, or specialty communication application, often an encrypted

10   one such as WhatsApp, and most often by smartphone.  Members of the

11   conspiracy commonly carry their smartphones, which include the

12   contact information for their co-conspirators, on or near their

13   persons, such as in their cars or residences.

14                   V.   **STATEMENT OF PROBABLE CAUSE**

15       15.  Homeland Security Investigations (HSI) Los Angeles, HSI

16   Pensacola, HSI Attaché Bucharest, HSI Attaché Vienna, United States

17   Secret Service (USSS) San Diego, and Romanian Law Enforcement

18   (hereinafter collectively referred to as "Investigators") are

19   currently investigating a Romanian Transnational Criminal

20   Organization (TCO). I am the assigned case agent and have been

21   directly involved with the investigation for approximately 18 months.

22       16.  In summary, the investigation has revealed that members of

23   this Romanian TCO operate various organized crimes groups that have

24   specializations including human smuggling, narcotics smuggling, money

25   laundering, import and export violations, organized retail theft,

26   gambling, prostitution, violence, credit-card skimming, and financial

27   fraud schemes domestically and internationally. Investigators have

28

                                    6

1   identified numerous members of this Romanian TCO, including a

2   Romanian national identified as MIHAI TRIF, DOB: XX/XX/1993.

3       17.  The investigation to date has revealed that TRIF likely

4   unlawfully entered the United States within the last 24 months, most

5   likely from Canada. Specifically, I have received information from

6   Canadian authorities showing that TRIF entered Canada via Montreal

7   International Airport on September 9, 2022, from Paris, France. TRIF

8   was granted entry into Canada as a visitor and used a valid Romanian

9   passport.

10      18.  I have conducted queries in law enforcement databases and

11  have been unable to locate any lawful entry and subsequent admission

12  into the United States after TRIF's entry into Canada on September 9,

13  2022. Based on my training and experience, I know that it is common

14  practice for members of Romanian TCOs and other illegal aliens

15  engaged in criminal activity to enter the United States illegally

16  through Canada or Mexico in order to evade law enforcement Thus, TRIF

17  is illegally present in the United States with no lawful status.

18      19.  In the United States, TRIF has at least two arrests with no

19  dispositions in California, including a February 2023 misdemeanor

20  arrest for Petty Theft and a June 2023 felony arrest for Inflict

21  Corporal Injury to Spouse / Cohabitant, referencing FBI No XXXXXXPAL

22  and California State ID XXXXX888. The prosecution status of both

23  cases is currently unknown to me. As detailed herein, these arrests

24  were made after TRIF unlawfully entered the United States at some

25  time after September 9, 2022. Despite TRIF's immigration status, the

26  arresting agencies had no legal authority to question TRIF's

27  immigration status. Additionally, TRIF was arrested in the state of

28

1    California, which is regarded as a "sanctuary state".[1] Thus,

2    immigration authorities were not aware of TRIF's arrest and

3    subsequent temporary detention.

4        20.   As detailed herein, Investigators and my subsequent

5    investigation have identified at least 15 fraudulent and fictitious

6    identities directly attributable to TRIF and TRIF's fraud schemes.

7    Several of the identities were identified prior to TRIF using them

8    (i.e., actively targeting inbound international shipments that seized

9    the fraudulent documents), several of the identities were identified

10   after-the-fact as part of a historical financial investigation, and

11   at least two are currently being proactively investigated as newly

12   assumed identities that TRIF is believed to be actively using,

13   including one as part of a new Confidence Fraud Scheme (i.e., "Karel

14   TOKAR") and another as an identity TRIF is using to lauder illicit

15   proceeds and elude detection by law enforcement (i.e., "Ivan

16   BUGATZI").

17       21.   For purposes of this affidavit, I have conducted an in-

18   depth analysis of TRIF's three most recent identities, including

19   "Marek BALVIN", "Karel TOKAR", and "Ivan BUGATZI". These three

20   identities are recent and relevant to my ongoing investigation into

21   TRIF and TRIF's fraud schemes several ways and encompasses the

22   relevant period of August - Present.

23       22.   At this time, TRIF's full role in the fraud schemes is

24   currently unknown; however, the investigation revealed that TRIF at a

25   minimum is responsible for creating fictitious and fraudulent

26

27       [1] In April 2017, the California State Senate approved a bill
     that increased protections for immigrants. The measure prohibits
     local law enforcement agencies from using resources to investigate,
28   detain, report or arrest people for immigration violations.

1   identities and opening and maintaining financial accounts used to
2   directly receive wire transfers from victims. TRIF then immediately
3   withdraws and spends the funds from swindled victims. While it
4   appears that TRIF is organizing the scheme, based on my training,
5   experience, and investigation to date, I believe that TRIF's fraud
6   schemes are complex and likely involves multiple unknown co-
7   conspirators.  For example, some victims reported talking to both a
8   male and female scammer by telephone.

9       23.  First, "Marek BALVIN" was identified as an identity used to
10  swindle at least six victims out of $141,278 in September 2024 using
11  two U.S. financial institutions, including Wells Fargo Account
12  XXXXXX5272 ("WF 'BALVIN' Account-5272") and Citibank Account
13  XXXXX7684 ("Citibank 'BALVIN' Account-7684"). Both accounts were
14  opened in August 2024 in the greater Los Angeles, CA area using the
15  fictious identity and supporting fraudulent documents of "Marek
16  BALVIN". I have provided still frame CCTV images from the Citibank
17  'BALVIN' Account-7684 showing that an individual I have identified by
18  sight as TRIF was captured opening the account on August 22, 2024,
19  and subsequently withdrawing funds via teller and ATM from the
20  account on September 9, 11, 13, and 17, 2024. The fund source was
21  from two separate victims that wired $15,000 and $16,000 on or about
22  September 9, 2024. The two victims were confirmed through victim
23  interviews and identified in North Dakota and New Jersey,
24  respectively. The victim funds were immediately withdrawn by TRIF
25  from a branch and ATM located less than 4 miles from the **SUBJECT**
26  **RESIDENCE.**

27
28
                                9

24.  Second, "Karel TOKAR" was identified as a new replacement identity used by TRIF as part of a new and ongoing fraud scheme. I identified "Karel TOKAR" by conducting an analysis of the identity "Marek BALVIN," including a phone analysis and other investigative techniques. The subsequent analysis identified the identity of "Karel TOKAR" and the suspected cellular phone attributable to the identity, identified as (818) 605-2154 ("TRIF's 'TOKAR' Phone-2154"). I positively identified TRIF as the user and holder of TRIF's 'TOKAR' Phone-2154 via subsequent court authorization geolocation of TRIF's 'TOKAR' Phone-2154 in conjunction with physical surveillance in November 2024 and other investigative techniques. This also assisted in identifying the **SUBJECT RESIDENCE** and the **SUBJECT VEHICLE.** The identification of "Karel TOKAR" was exclusively established by the initial identification of "Marek BALVIN". This is strong evidence to indicate that the identities are intertwined and directly related to each other.

25.  Third, "Ivan BUGATZI" was identified as TRIF's alias to launder his illicit proceeds and to live day-to-day in an attempt to elude detection by law enforcement. I identified "Ivan BUGATZI" by court authorization geolocation of TRIF's 'TOKAR' Phone-2154 in conjunction with physical surveillance and a review of CCTV footage in November 2024. These investigative techniques allowed Investigators to identify the identity of "Ivan BUGATZI", the **SUBJECT RESIDENCE,** the **SUBJECT VEHICLE,** and the suspected cellular phone attributable to the identity, identified as (310) 482-0611 ("TRIF's 'BUGATZI' Phone-0611"). I positively identified TRIF as the user and holder of TRIF's 'BUGATZI' Phone-0611 via subsequent court

1    authorization geolocation of TRIF's 'BUGATZI' Phone-0611 in

2    conjunction with physical surveillance in November 2024 and other

3    investigative techniques. The identification of "Ivan BUGATZI" was

4    exclusively established by the initial identification of "Marek

5    BALVIN" and the subsequent identification of "Karel TOKAR". This is

6    strong evidence to indicate that the identities are intertwined and

7    directly related to each other.

8         26.  TRIF's fictitious identities were also supported by

9    fraudulently created and/or altered foreign passports and other

10   identity documents, which were frequently often used to open U.S.

11   bank accounts and other records, including at Wells Fargo, Citibank,

12   Bank of America, and JP Morgan Chase Bank. Most, if not all, of the

13   bank accounts identified during the investigation were opened in

14   and/or had money withdrawn from the account(s) in the Central

15   District of California. Investigators have confirmed that the

16   passports are fraudulent and the identities are fictitious; however,

17   some of the passport numbers were legitimately issued at some point

18   and subsequently altered. Investigators also discovered that TRIF

19   often digitally enhanced and/or modified his self-image on the

20   fraudulent identity documents. Thus, often the individual photograph

21   on the passport (or other document(s)) appeared slightly different

22   but was determined to be TRIF based on several investigative

23   techniques, computer software, and international cooperation with

24   Romanian authorities. For example, the altered photo would change the

25   hair style, hair length, facial hair (i.e., mustache, beard, goatee),

26   and the general facial characteristics (i.e., face shape, eye

27   placement, etc.) Based on my training and experience, I know that

28

1   computer, specialized computer software, and some level of expertise

2   is required to alter photographs. I believe TRIF did this in an

3   attempt to elude detection by law enforcement and to obfuscate the

4   investigation and the subsequent ability of law enforcement to

5   identify TRIF.

6       27.  For example, Investigators and my subsequent investigation

7   detailed herein have identified at least 15 identities created and/or

8   used by TRIF and likely other co-conspirators as part of TRIF's

9   overall fraud schemes. Investigators have confirmed TRIF as the

10  creator of these fictitious and fraudulent identities several ways,

11  including coordination with Romanian law enforcement, the use of

12  facial recognition and other software, seizures attributable to

13  addresses utilized by TRIF (and other aliases), and the investigation

14  to date. I have also reviewed numerous images used on the below

15  documents and have determined that the individual depicted is TRIF. I

16  am familiar with the physical attributes and appearance of TRIF by

17  sight. The identities directly attributable to TRIF were as follows:

18  • Antonin LOUIS, COB: France, DOB: XX/XX/1992, PP Number XXXXX5060

19      (France); and,

20  • Sofiane MAX, COB: France, DOB: XX/XX/1992, PP Number XXXXX2440

21      (France); and,

22  • Claude GAUTHIER, COB: France, DOB: XX/XX/1990, PP Number

23      XXXXX6367 (France); and,

24  • Haden GOOSSENS, COB: Belgium, DOB: XX/XX/1990, PP Number

25      XXXX0878 (Belgium); and,

26  • Noah ARTHUR, COB: Belgium, DOB: XX/XX/1995, PP Number XXXX5421

27      (Belgium) ; and,

28

- Danuser BUCHER, COB: Switzerland, DOB: XX/XX/1990, PP Number XXXX9109 (Switzerland); and,
- Leon RUSU, COB: Canada, DOB: XX/XX/1990, PP Number XXXX8022 (Canada); and,
- Tiberiu ENZO – DOB: Netherlands, DOB: Unknown, PP Number XXXXK193; and,
- Axel MULLER – DOB: Germany, DOB: Unknown, PP Number XXXXXR86
- Glenn GREENFIELD – Unknown, NFI ("No Further Information")
- Aurelio ROTH – Unknown, NFI
- David HUGO, COB: Luxemburg, DOB: XX/XX/1991, PP Number XXXXV7K4 (Luxemburg); and,
- Marek BALVIN, COB: Czech Republic, DOB: XX/XX/1994, PP Number XXXX7084 (Czech Republic); and,
- Karel TOKAR, COB: Czech Republic, DOB: XX/XX/1989, PP Number XXXX5348 (Czech Republic); and,
- Ivan BUGATZI, COB: Canada, DOB: XX/XX/1991, PP Number XXXX9334, Canadian driver's license XXXXXXXXX9109.

28.  Investigators have conducted physical surveillance, served administrative summons, conducted interviews, spoken with other law enforcement officers, executed court authorized searches and seizures, conducted international controlled deliveries, reviewed financial records, and various other investigative techniques as part of the ongoing investigation into TRIF and TRIF's Confidence Fraud Schemes and TRIF's fictitious and fraudulent identities.

29.  My subsequent investigation has identified at least five separate financial fraud schemes committed and/or being committed by MIHAI TRIF and likely other known and unknown co-conspirators using

1  fictitious and fraudulently created identities between approximately

2  March 2023 - Present, including "Marek BALVIN," and "Karel TOKAR". My

3  investigation has also identified TRIF's "clean" fictitious and

4  fraudulent identity that TRIF likely uses for day-to-day living.

5  Based on my training, experience, and investigation to date, I

6  believe that TRIF has compartmentalized his identities used in fraud

7  schemes (i.e., "Marek BALVIN", "Karel TOKAR", and others) from his

8  "clean" day-to-day identity (i.e., "Ivan BUGATZI") to elude detection

9  by law enforcement. For purposes of the affidavit, I have conducted

10 an in-depth analysis of "Marek BALVIN", "Karel TOKAR", and "Ivan

11 BUGATZI", as detailed below.

12       VI.  **SUMMARY OF FRAUD SCHEMES COMMITTED BY TRIF AND OTHERS**

13      30.  Based on my training and experience, the fraud schemes

14 committed by TRIF and other unknown co-conspirators can be referred

15 to as a Confidence Fraud Scheme. In general, a Confidence Fraud

16 Scheme is a sophisticated plot to deceive and/or defraud individuals

17 into giving money or other personal information to a scammer.

18 Scammers often use a variety of methods to gain the trust of their

19 victims, including building relationships, creating a sense of trust,

20 and exploiting vulnerabilities.

21      31.  In this case, TRIF and likely other unknown co-conspirators

22 purported to be a seller(s) of a piece of heavy-duty equipment (i.e.,

23 a Kubota L39 backhoe loader tractor) or a vintage restored vehicle

24 (i.e., a 1965 Chevrolet C-10) on a spoofed website[2] and/or on

25

26      [2] Website spoofing is a scam where cyber criminals create a
website that closely resembles a trusted brand as well as a domain
that is virtually identical to a brand's web domain. The goal of

27 website spoofing is to lure a brand's customers, suppliers, partners
and employees to a fraudulent website and convince them to share

28 sensitive information like login credentials, Social Security

1  Facebook Marketplace[3]. Ultimately, there was no tractor or vehicle

2  for sale and sole purpose of the scheme was to swindle victims of

3  their money. TRIF's Confidence Fraud Scheme was then layered with

4  other information used to deceive potential victims into believing

5  the purported sale of the item was authentic, including the use of a

6  spoofed and/or legitimate appearing websites (i.e., "Dennis Polk

7  Equipment" and "S&S Auto Sales"), the use of several VoIP phone

8  numbers[4] to communicate with the victims in various capacities (i.e.,

9  the dealerships, the shipper, etc.), the use of a shipping and other

10 companies to coordinate the sale and/or the "transport" of the

11 vehicle to the victim (i.e., BENSON C EQUIPMENT LLC, DP EQUIPMENT

12 LLC, OUTLET RETAIL ONE, LLC, and STALLION CARGO AZ LLC), a use of The

13 UPS Store Post Mailboxes (PMBs) (i.e., The UPS Store #5391 in

14 Commerce, CA in the name of "Sofiane MAX", The UPS Store #0015 in

15 Huntington Beach, CA and The UPS Store #0012 in Los Angeles, CA in

16 the name of "Antonin LOUIS", The UPS Store #5626 in Sun Valley, CA in

17 the name of "Marek BALVIN", and The UPS Store #3272 in Stevenson

18 Ranch, CA in the name of "Karel TOKAR", and The UPS Store #4466 in

19 Long Beach, CA in the name of "Ivan BUGATZI"), and at least four U.S.

20

21 numbers, credit card information or bank account numbers.
   Additionally, a spoofed website can also be used to give the
22 appearance of the purported business and/or business activity to
   appear legitimate.

23      [3] Facebook Marketplace is classified-ad section of the social
24 network that specializes in helping individuals and businesses sell
   items locally. Marketplace is Facebook's expansion into markets to
25 compete with services like eBay, Craigslist, and other similar
   platforms.

26      [4] Voice over Internet Protocol (VoIP) is a technology that
   allows users to make phone calls and other communications over the
27 internet instead of a traditional phone line. VoIP can be used on a
   variety of devices, including computers, smartphones, and VoIP
28 phones.

1   financial institutions in furtherance of the fraud scheme (i.e., Bank

2   of America, JP Morgan Chase Bank, Wells Fargo, and Citibank).[5]

3       32.   The investigation revealed that TRIF would generally use

4   these fraudulent and fictitious identities and related accounts for

5   30-90 days as part of a fraud scheme and then transition to a newly

6   established fictitious identity once the fraud scheme was fruitful

7   and financially benefited TRIF, i.e., a victim(s) was swindled out of

8   money and TRIF successfully received / withdrew the funds. This

9   constant transition and creation of new identities has made it

10  difficult for law enforcement to proactively identity and investigate

11  TRIF and TRIF's fraud schemes in real time. Thus, Investigators are

12  often investigating TRIF's crimes historically, i.e., after they have

13  already occurred and TRIF has transitioned to a new identity.

14  Additionally, the high-quality fraudulent identity documents created

15  and used by TRIF and TRIF's apparent knowledge base regarding the use

16  of technology to defraud victims has also made it more difficult for

17  law enforcement to investigate. This is evidenced by TRIF's ability

18  to continuously and successfully open bank accounts at U.S. financial

19  institutions and elude detection by law enforcement for more than 18

20  months.

21      VII. **VICTIM IDENTIFICATION AND INFORMATION RELATED TO TRIF AND
            OTHERS' CONFIDENCE FRAUD SCHEMES**

22      33.   My and other Investigators continued investigation into

23  TRIF and TRIF's related Confidence Fraud Schemes have identified a

24  total of 14 victims with a total loss of $351,806 in ten different

25  states, including Alabama, California, Illinois, Kansas, Kentucky,

26

27      [5] Bank of America, JP Morgan Chase Bank, Wells Fargo, and
    Citibank are federally insured by the Federal Deposit Insurance
    Corporation (FDIC) and therefore meets the federal definition of a
28  "financial institution" pursuant to 18 U.S.C. §20.

1   Missouri, Nevada, New Jersey, North Dakota, and Oklahoma. The victims
2   were defrauded between approximately May 2023 – September 2024.

3        34.   As part of the investigation, Investigators and/or I have
4   confirmed that the victims were in fact victims of TRIF's Confidence
5   Fraud Schemes several ways. Specifically, Investigators and/or I have
6   spoken with local law enforcement, interviewed more than 10 of the
7   victims, interviewed at least one family member of a victim, have
8   reviewed at least eight of the filed police reports detailing the
9   incidents, have reviewed supporting bank records detailing the wire
10  transfers, and conducted additional investigative follow up. Based on
11  my training, experience, and investigation to date, I believe all
12  identified 14 victims were victims of a Confidence Fraud Scheme
13  perpetuated by TRIF and likely other unknown co-conspirators. I am
14  intentionally being vague about the names and other unique
15  identifying of the victims to protect the identities of the victims.

16       35.   Generally, banks are obligated to refund money lost to
17  fraud (i.e., identity theft, credit card fraud, etc.); however, banks
18  may deny the refund if the customer was negligent or involved in the
19  scam. Thus, in this case, all victims were at a *complete financial*
20  *loss because the wire transfers were originated by the victim*.
21  Additionally, at least two victims are currently making monthly
22  payments on loans that were obtained to fund the wire transfers in
23  TRIF's Confidence Fraud Scheme.

24       36.   I have learned through the continued investigation that the
25  losses sustained by each individual victim was substantial, including
26  emotionally and financially. In general, a lot of the victims used
27  their life savings and/or took out a loan to purchase an item that
28

17

1  would benefit themselves, their current business, and/or a new

2  business. Often, the victims were in small towns (i.e., less than

3  5,000 people) and were directly and/or indirectly involved in

4  construction, agriculture, or other employment.

5     37.  For example, one of the victims was identified as a Captain

6  at a local police department in the greater California area. Despite

7  this victim's extensive police training and experience, he/she was

8  successfully swindled out of approximately $20,000. I also identified

9  at least two victims that had not even reported the crime because of

10 shame and embarrassment. Based on my training and experience, I

11 believe this is strong evidence to support my belief of TRIF's

12 Confidence Fraud Schemes were sophisticated.

13    38.  Specifically, between approximately March – May 2023 TRIF

14 used the identity "Sofiane MAX" and related fictious business BENSON

15 C EQUIPMENT LLC to open and maintain business bank accounts Bank of

16 America Account-9289 ("BofA 'MAX' Account-9289") and JP Morgan Chase

17 Account-8985 ("JPMC 'MAX' Account-8985"). These two accounts were

18 used to receive funds from at least five victims out of $146,131. The

19 funds were immediately withdrawn, spent, and/or transferred in the

20 greater Los Angeles, CA area.

21    39.  Between approximately March – May 2023 TRIF used the

22 identity "Antonin LOUIS" and related fictious business DP EQUIPMENT

23 LLC to open and maintain business bank account Citibank Account-0721

24 ("Citibank 'LOUIS' Account-0721"). This account was used to receive

25 funds from at least two victims out of $43,747. The funds were

26 immediately withdrawn, spent, and/or transferred in the greater Los

27 Angeles, CA area.

28

1   40.   Between approximately November – December 2023 TRIF used

2   the identity "Leon RUSU" and related fictitious business OUTLET

3   RETAIL ONE, LLC to open and maintain business bank account Bank of

4   America Account-6936 ("BofA 'RUSU' Account-6936"). This account was

5   used to receive funds from at least one victim out of $20,650. The

6   funds were immediately withdrawn, spent, and/or transferred in the

7   greater Los Angeles, CA area.

8         ***Identification and Analysis of "Marek BALVIN"***

9         41.   As detailed herein, the investigation identified the

10  fictious and fraudulent identity of "Marek BALVIN" as being TRIF. The

11  identification of "Marek BALVIN" started from a reported fraud scam

12  that occurred in the greater Bismarck, North Dakota area using a

13  Citibank account. HSI Bismarck subsequently initiated the

14  investigation into fraud scam. The fraud scam was the same modus

15  operandi as TRIF's Confidence Fraud Scams. HSI Bismarck's subsequent

16  investigation and case coordination then overlapped with my

17  investigation into TRIF and other known and unknown co-conspirators.

18  HSI Vienna also assisted in the investigation because of the Czech

19  Republic passport that identified. The investigation then expanded

20  and identified a second bank account in the name of "Marek BALVIN" at

21  Wells Fargo.

22        42.   In summary, I learned that between approximately June –

23  September 2024, TRIF used the identity "Marek BALVIN" and related

24  fictious business STALLION CARGO AZ LLC to open and maintain business

25  bank accounts WF 'BALVIN' Account-5272 and Citibank 'BALVIN' Account-

26  7684. These accounts were used to receive funds from at least six

27  victims out of $141,278, including two victims initially identified

28

1  by an HSI Bismarck investigation. Both accounts were opened in August

2  2023 in the greater Los Angeles, CA area using the fictious identity

3  and supporting fraudulent documents of "Marek BALVIN".

4    43.  As shown below, I have provided still frame CCTV images

5  from the Citibank 'BALVIN' Account-7684 showing that an individual I

6  have identified by sight as TRIF was captured opening the account on

7  August 22, 2024, and subsequently withdrawing funds via teller and

8  ATM from the account on September 9, 11, 13, and 17, 2024. The fund

9  source was from two separate victims that wired $15,000 and $16,000

10 on or about September 9, 2024. The two victims were identified as

11 residing in North Dakota and New Jersey and were confirmed as victims

12 through victim interviews by HSI Bismarck. A subsequent review of

13 bank records for Citibank 'BALVIN' Account-7684 showed that the

14 victim funds were immediately withdrawn by TRIF from a branch and

15 ATM. The bank branch for all the transactions occurred at the

16 Citibank located at 360 E Magnolia Burbank, CA 91502 ("Citibank

17 Burbank"), which is less than 4 miles from the **SUBJECT RESIDENCE.**

18 Additionally, a review of the ATM CCTV footage from September 17,

19 2024, showed TRIF arrived and departed on an e-scooter. As detailed

20 herein, this identical scooter was later observed in the trunk of the

21 **SUBJECT VEHICLE** on November 13, 2024, at a car wash in Arcadia, CA.

22 The positive identification of TRIF as the sole individual that

23 opened, maintained, and withdrew funds from the account is strong

24 evidence to indicate TRIF's direct involvement in the Confidence

25 Fraud Schemes.

26   44.  An image of an individual I identified by sight as TRIF

27 opening Citibank 'BALVIN' Account-7684 on August 22, 2024, is

28

depicted below. The account was opened at Citibank Burbank, which was less than 4 miles to the **SUBJECT RESIDENCE**. The image looked like this:



45.  An image of an individual I identified by sight as TRIF withdrawing funds from Citibank 'BALVIN' Account-7684 on September 11, 2024, is depicted below. The funds that were withdrawn were funds from an identified victim of a Confidence Fraud Scheme. The funds were withdrawn from Citibank Burbank less than 4 miles to the **SUBJECT RESIDENCE**. It also appeared that during the transaction TRIF presented what appeared to be a passport for identification verification purposes. Based on my training and experience, I believe TRIF presented the fictious and fraudulent passport in the name of "Marek BALVIN". The image looked like this:



46.   Several images of an individual I identified by sight as TRIF withdrawing funds from Citibank 'BALVIN' Account-7684 ATM in September 2024, is depicted below. The funds were withdrawn from Citibank Burbank, which was less than 4 miles to the **SUBJECT RESIDENCE**. The funds that were withdrawn were funds from an identified victim of a Confidence Fraud Scheme. In summary, TRIF arrived, withdrew funds using a card from TRIF's wallet, and subsequently departed on an e-scooter. The images looked like this:



47.   As detailed herein, the identification and subsequent investigation into the fictitious and fraudulent identity of "Marek BALVIN" was the catalyst that assisted law enforcement in identifying the fictious and fraudulent identifies "Karel TOKAR" and "Ivan BUGATZI". As detailed below, the investigation confirmed that TRIF was the sole individual directly attributable to "Karel TOKAR" and "Ivan BUGATZI".

48.   As part of the ongoing investigation, on November 7, 2024, United States Magistrate Judge Maria A. Audero authorized a Search and Seizure Search Warrant for prospective live tracking via GPS coordinates and historical information associated with TRIF's 'TOKAR' Phone-2154. The warrant authorized prospective live tracking via GPS

1   coordinates for 45 days and historical information for 30 days from

2   the date of warrant, referencing case number 2:24-MJ-6739. The phone

3   number was directly attributable to the fictitious and fraudulent

4   identity of "Karel TOKAR".

5       49.  Between approximately November – 13, 2024, I did not

6   receive any geolocation information for TRIF's 'TOKAR' Phone-2154.

7   Based on my training and experience, this was consistent with the

8   phone being powered off. Then, on November 13, 2024, between

9   approximately 9:59 a.m. PST to 5:29 p.m. PST, the phone powered on

10  and geolocation was received in 10-minute increments. The following

11  day, on November 14, 2024, HSI Vienna SA C. Lindsly conducted a

12  review and analysis of the geolocation information received. As

13  detailed below, SA Lindsly's subsequent analysis of the limited data

14  received pursuant to the court authorized geolocation identified

15  several locations the phone was located at, including Fasching's Car

16  Wash, 425 N Santa Anita Ave, Arcadia, CA 91006 (Fasching's Car Wash)

17  and a parking lot at Arcadia Mall. The geolocation information

18  received was very accurate, including +/- 8 meters. This subsequently

19  allowed law enforcement to collect and review CCTV footage from both

20  locations which assisted the investigation several ways. First, a

21  review of the CCTV footage confirmed that TRIF was the holder of

22  TRIF's 'TOKAR' Phone-2154. Second, it identified TRIF's vehicle as

23  the **SUBJECT VEHICLE**. Third, it identified another previously unknown

24  alias, identified herein as "Ivan BUGATZI".

25      50.  An image of an individual I identified by sight as TRIF and

26  the **SUBJECT VEHICLE** on November 13, 2024, at Fasching's Car Wash is

27  depicted below. Of note, I identified an e-scooter in the trunk of

28

1 the SUBJECT VEHICLE consistent with the e-scooter TRIF used to

2 withdraw funds from Citibank 'BALVIN' Account-7684 in September,

3 2024. The image of TRIF and the **SUBJECT VEHICLE** (with the e-scooter

4 in the trunk) looked like this:

 

10      51.   Subsequent record checks revealed that TRIF's Range Rover

11 was an Enterprise rental car rented on October 3, 2024, to "Ivan

12 BUGATZI" and that "Ivan BUGATZI" (i.e., TRIF) is paying approximately

13 $4,000 per month to rent TRIF's Range Rover. To date, TRIF still has

14 an active rental agreement with Enterprise with an expected return

15 date of November 28, 2024, according to their business records. The

16 **SUBJECT VEHICLE** was rented using the fictitious and fraudulent

17 identify of "Ivan BUGAZTI" and paid for using a related Bank of

18 America account, as detailed herein. The Bank of America account and

19 related information is detailed below. I have also reviewed a CCTV

20 still frame on October 3, 2024, from Enterprise and confirmed that

21 the purported renter "Ivan BUGATZI" was in fact TRIF. An image of an

22 individual I identified by sight as TRIF and the **SUBJECT VEHICLE**

23 departing Enterprise on October 3, 2024, is depicted below. The image

24 looked like this:

25

26

27

28

52.   The continued investigation into "Ivan BUGATZI" identified Bank of America Account number XXXXXXXXXXXX3857 ("BofA 'BUGATZI' Account-3857") and Bank of America credit card number XXXXXXXXXXXX0602 ("BofA 'BUGATZI' CC-0602") as accounts currently being used by "Ivan BUGATZI" (i.e., TRIF). Investigators have reviewed and discussed with an authorized representative the two Bank of America accounts attributable to "Ivan BUGAZTI".

53.   In summary, I learned that the accounts were opened on September 17, 2024, using the fictitious and fraudulent identity and supporting documents of "Ivan BUGATZI". In general, it appears that the two accounts are being used to live lavishly with likely illicit proceeds of swindled victims using other aliases and Confidence Fraud Schemes in the greater Los Angeles, CA area, i.e., rent high-end vehicles, travel, purchase expensive jewelry, dine at restaurants, etc. The two accounts generally maintained a low account balance and would have enough funds in the account to cover general day-to-day transactions, other purchases, and to make frequent payments on BofA 'BUGATZI' CC-0602. All the funds into the accounts were cash deposits either via ATM and/or teller deposits in the greater Los Angeles, CA area. The source of the funds is unknown; however, based on my

25

1  training and experience I believe that the funds are likely proceeds

2  of TRIF's Confidence Fraud Schemes.

3      54.  Investigators also learned some of the purchases were as

4  follows: UberEATS, parking, Zelle payments, purchases at various

5  grocery stores, etc. There were also numerous payments to DDHD

6  Jewelry in Los Angeles, CA, including $1,000 and $2,000 payments on

7  November 18 and 19, respectively. Open-source queries revealed that

8  DDHD Jewelry was a high-end custom jewelry store with the motto, "You

9  Imagine It, We Bring it to Life". DDHD Jewelry also sold other

10  jewelry, including men's rings, bracelets, women's rings, chains,

11  earrings, pendants, etc. Based on my training, experience, and

12  investigation to date, I believe these payments were likely for

13  jewelry TRIF has ordered using proceeds from his known and unknown

14  Confidence Fraud Schemes, as detailed herein.

15      55.  Investigators also learned that TRIF's Bank of America CC-

16  0602 also had regular day-to-day transactions, which were

17  subsequently paid off via BofA 'BUGATZI' Account-3857. The authorized

18  Bank of America representative stated that the activity of both

19  accounts generally would not raise any suspicion by banking

20  authorities. Based on my training and experience, I believe this low-

21  risk transactional activity was conducted by TRIF purposely to elude

22  detection by law enforcement and enable TRIF to use the identity of

23  "Ivan BUGATZI" for day-to-day living using illicit proceeds procured

24  from TRIF's Confidence Fraud Schemes.

25  VIII.  **IDENTIFICATION OF THE SUBJECT RESIDENCE AND SUBJECT VEHICLE**

26      56.  As detailed herein, I am investigating TRIF for the SUBJECT

27  OFFENSES. My investigation has spanned approximately 20 months and

28

1    has identified a sophisticated and complex fraud scheme perpetuated

2    by TRIF and other known and unknown co-conspirators. Over the span of

3    several months, Investigators and I have used numerous investigative

4    techniques in an attempt to disrupt TRIF's ongoing fraud schemes. A

5    primary objective of my ongoing investigation was to identify TRIF's

6    primary residence, potential stash locations, and vehicles used by

7    TRIF. As detailed below, the continued investigation has identified

8    the **SUBJECT RESIDENCE** and the **SUBJECT VEHICLE** as TRIF's primary

9    residence and vehicle, respectively.

10    57.  Specifically, I have worked a historical and proactive

11    investigation to disrupt and dismantle TRIF's Confidence Fraud

12    Schemes and likely other fraud related activities. As detailed

13    herein, I have identified TRIF's "clean" identity as "Ivan BUGATZI".

14    The purpose of TRIF using "Ivan BUGATZI" is to launder illicit

15    proceeds and to elude detection by law enforcement.

16    58.  As detailed above, my investigation identified several Bank

17    of America accounts attributable to "Ivan BUGATZI". A review of those

18    accounts identified numerous transactions billed by UberEATS,

19    including as recently as November 2024. Based on my training,

20    experience, and opensource queries, I know that UberEATS is an online

21    food ordering and delivery platform launched by the company Uber in

22    2014. The meals are delivered by couriers using various methods,

23    including cars, scooters, bikes, or on foot. UberEATS is operational

24    in over 6,000 cities in 45 countries as of 2021. Generally, a

25    customer of UberEATS use an application to order food. The use of the

26    UberEATS application requires a customer to create an account,

27    including customer name, address, cellular phone number, payment

28

method(s), and other information. The provided cellular phone number
is used in the event an UberEATS delivery person or the Uber driver
needs to contact the intended customer. Additionally, once an
UberEATS order is placed and subsequently delivered, UberEATS
maintains that delivery information, including restaurant, delivery
date and time, and delivery address, among other things.

59.  Based in part on the aforementioned facts, on November 22,
2024, United States Magistrate Judge Alicia Rosenberg authorized a
2703(d) Court Order requesting records associated to cellular phone
number TRIF's 'BUGAZTI' Phone-0611 and customer name "Ivan BUGATZI".
The order authorized the requested records from the date of the
account(s) inception to date of order, referencing case number 2:24-
MJ-7053.

60.  The following day, on or about November 23, 2024,
Investigators served the Court Order via Uber Technologies, Inc's
("Uber") law enforcement portal, referencing internal Uber case
number 00498516.

61.  The following day, on November 24, 2024, Investigators
received the records from UberEATS pursuant to the 2703(d) Court
Order. The records were received via Uber's law enforcement portal.

62.  On the same day HSI Vienna SA Lindsly conducted an analysis
of the UberEATS records. I have spoken with SA Lindsly and conducted
an independent review of the records. The records received two files,
including a file titled "Response to Request – 00498516.pdf" and
"Attachment to Response – 00498516.xlxs".

63.  In summary the records revealed that "Ivan BUGAZTI" (i.e.,
TRIF) had two separate UberEATS accounts, including Display Names

"Ivan Bugatzi" and "Ivan Bug". In summary, based on a review of the records it appears that TRIF used Display Name "Ivan Bugatzi" from approximately September 29 – October 15, 2024, and Display Name "Ivan Bug" from approximately October 16 – Present, 2024. This was corroborated by a review of IP address logs, customer information, and customer order information.

64. As detailed below, a review of the records identified TRIF's primary residence as the **SUBJECT RESIDENCE**. In summary, between September 29 – November 20, 2024, TRIF (using Display Names "Ivan Bugatzi" and "Ivan Bug") had a total of 17 food deliveries. 16 of the 17 food deliveries were delivered to the **SUBJECT RESIDENCE.** The only food delivery to an alternate address occurred on September 29, 2024, and was delivered to 310 Tahiti Way #201, Marina Del Rey, CA. Additionally, I reviewed the GPS coordinates submitted by the UberEATS delivery driver, which documented the exact location the food was delivered. The delivery GPS coordinates are consistent with the **SUBJECT RESIDENCE.** The order deliveries were as follows:

| Account | Amount | Order Date / Time | Delivery Date / Time | Delivery Address |
|---|---|---|---|---|
| Ivan Bugatzi | $74.36 | 2024-09-29 12:51:49 | 2024-09-29 13:33:48 | 310 Tahiti Way |
| Ivan Bugatzi | $13.99 | 2024-10-01 9:21:22 | 2024-10-01 10:03:48 | **SUBJECT RESIDENCE** |
| Ivan Bugatzi | $41.91 | 2024-10-02 21:28:45 | 2024-10-02 22:26:00 | **SUBJECT RESIDENCE** |
| Ivan Bug | $23.92 | 2024-10-26 17:34:48 | 2024-10-26 17:48:46 | **SUBJECT RESIDENCE** |
| Ivan Bug | $39.46 | 2024-10-27 9:53:42 | 2024-10-27 10:27:46 | **SUBJECT RESIDENCE** |
| Ivan Bug | $121.45 | 2024-10-28 20:27:35 | 2024-10-28 21:21:28 | **SUBJECT RESIDENCE** |
| Ivan Bug | $32.96 | 2024-11-01 12:05:18 | 2024-11-01 12:53:20 | **SUBJECT RESIDENCE** |
| Ivan Bug | $17.98 | 2024-11-01 19:15:15 | 2024-11-01 20:00:08 | **SUBJECT RESIDENCE** |
| Ivan Bug | $81.97 | 2024-11-02 18:49:36 | 2024-11-02 19:37:52 | **SUBJECT RESIDENCE** |
| Ivan Bug | $18.96 | 2024-11-03 13:34:33 | 2024-11-03 14:10:35 | **SUBJECT RESIDENCE** |
| Ivan Bug | $61.80 | 2024-11-04 20:00:15 | 2024-11-04 20:52:35 | **SUBJECT RESIDENCE** |
| Ivan Bug | $81.97 | 2024-11-05 19:10:08 | 2024-11-05 19:53:08 | **SUBJECT RESIDENCE** |
| Ivan Bug | $25.15 | 2024-11-07 23:35:45 | 2024-11-07 23:48:54 | **SUBJECT RESIDENCE** |

| Ivan Bug | $86.83 | 2024-11-15 19:28:58 | 2024-11-15 20:26:00 | **SUBJECT RESIDENCE** |
|---|---|---|---|---|
| Ivan Bug | $24.94 | 2024-11-16 16:05:31 | 2024-11-16 17:07:42 | **SUBJECT RESIDENCE** |
| Ivan Bug | $40.99 | 2024-11-19 20:09:24 | 2024-11-19 21:08:28 | **SUBJECT RESIDENCE** |
| Ivan Bug | $21.96 | 2024-11-20 23:24:55 | 2024-11-20 23:44:15 | **SUBJECT RESIDENCE** |

65.    As detailed herein, Investigators and I had identified TRIF's primary vehicle as the **SUBJECT VEHICLE** and TRIF's primary residence as the **SUBJECT RESIDENCE**. On November 25, 2024, at approximately 10:45 a.m. PST, HSI SA Yoo was conducting covert physical surveillance immediately in front of the **SUBJECT RESIDENCE**. In summary, SA Yoo observed the **SUBJECT VEHICLE** pull out of a dedicated gate that gave access to the **SUBJECT RESIDENCE**. Based on SA Yoo's training and experience, it appeared that the gate was only accessible by occupants of the small complex, including the **SUBJECT RESIDENCE**, likely by an electronic remote. I also conducted a review of court authorized geolocation information obtained from TRIF's 'TOKAR' Phone-2154 and TRIF's "BUGATZI" Phone-0611. A subsequent review of the geolocation information for both phones was consistent with TRIF arriving and departing the area of the **SUBJECT RESIDENCE** consistent with SA Yoo's physical observations. Thus, this corroborates the identification of the **SUBJECT RESIDENCE** and **SUBJECT VEHICLE** as TRIF's primary residence and primary vehicle.

**TRIF Used Skimmed Debit Cards at ATMs**

66.    Per video footage provided to me by Beverly Hills Police Department, TRIF utilized a Bank of America ATM in Beverly Hills, CA on February 20, 2023. Bank of America advised me that TRIF had attempted to use three stolen EDD cards and one EBT card at the same Bank of America ATM on February 20, 2023. I personally reviewed video footage of TRIF at the Bank of America ATM and confirmed his identity as the individual who attempted to use the three stolen EDD cards and

30

1  one EBT card. (To identify TRIF from surveillance images, I compared

2  them to Romanian passport photos of MIHAI TRIF which I received from

3  Romanian law enforcement.) Based on my training and experience, I

4  know that criminals utilize various skimming devices and tools to

5  steal information from EBT and EDD account holders. Criminals

6  involved in skimming crimes often place skimming devices on ATMs and

7  credit-card machines in order to steal the account numbers of EBT and

8  EDD cards. Criminals then utilize other devices to create duplicate

9  debit-cards which contain the stolen EBT and EDD victims account

10  numbers on then. Criminals then go to ATMs and attempt to drain those

11  victims' EBT and EDD accounts, also known as "cash-outs," as TRIF was

12  captured on video doing. Accordingly, persons involved in skimming,

13  like TRIF, commonly have evidence of skimming in their vehicles and

14  residences, such as skimmers, blank cards which can be re-encoded

15  with victims' account information, access card reader-writers, spy

16  cameras, and related equipment.

17  IX.  **TRIF IS PREPARING TO CHANGE RESIDENCES**

18  67. While investigating the **SUBJECT RESIDENCE** online on

19  November 26, 2024, I saw that it was advertised as being for rent. I

20  called the listed number and pretended to be interested in renting

21  it. In summary, I learned that the current tenant (i.e., TRIF) would

22  be vacating it on November 29, 2024. Additionally, as detailed

23  herein, a subsequent review of the Enterprise rental agreement showed

24  that the **SUBJECT VEHICLE** is scheduled to be returned on November 28,

25  2024. Based on my training and experience, I believe it is likely

26  that TRIF might be in the process of transitioning to a new identity.

27  Thus, the requested warrant is time sensitive. On November 27, 2024,

28

1  I was watching the **SUBJECT RESIDENCE** and personally observed TRIF

2  exit the residence and then enter it again in the morning.

3          X.   **TRAINING AND EXPEREINCE ON DIGITAL DEVICES**[6]

4       68.   Based on my training, experience, and information from

5  those involved in the forensic examination of digital devices, I know

6  that the following electronic evidence, inter alia, is often

7  retrievable from digital devices:

8       a.   Forensic methods may uncover electronic files or remnants

9  of such files months or even years after the files have been

10 downloaded, deleted, or viewed via the Internet.  Normally, when a

11 person deletes a file on a computer, the data contained in the file

12 does not disappear; rather, the data remain on the hard drive until

13 overwritten by new data, which may only occur after a long period of

14 time.  Similarly, files viewed on the Internet are often

15 automatically downloaded into a temporary directory or cache that are

16 only overwritten as they are replaced with more recently downloaded

17 or viewed content and may also be recoverable months or years later.

18      b.   Digital devices often contain electronic evidence related

19 to a crime, the device's user, or the existence of evidence in other

20 locations, such as, how the device has been used, what it has been

21 used for, who has used it, and who has been responsible for creating

22 or maintaining records, documents, programs, applications, and

23 

24 _____

       [6] As used herein, the term "digital device" includes any
25 electronic system or device capable of storing or processing data in
   digital form, including central processing units; desktop, laptop,
26 notebook, and tablet computers; personal digital assistants; wireless
   communication devices, such as paging devices, mobile telephones, and
27 smart phones; digital cameras; gaming consoles; peripheral
   input/output devices, such as keyboards, printers, scanners,
28 monitors, and drives; related communications devices, such as modems,
   routers, cables, and connections; storage media; and security
   devices.

                                    32

1    materials on the device.  That evidence is often stored in logs and

2    other artifacts that are not kept in places where the user stores

3    files, and in places where the user may be unaware of them.  For

4    example, recoverable data can include evidence of deleted or edited

5    files; recently used tasks and processes; online nicknames and

6    passwords in the form of configuration data stored by browser, e-

7    mail, and chat programs; attachment of other devices; times the

8    device was in use; and file creation dates and sequence.

9         c.   The absence of data on a digital device may be evidence of

10   how the device was used, what it was used for, and who used it.  For

11   example, showing the absence of certain software on a device may be

12   necessary to rebut a claim that the device was being controlled

13   remotely by such software.

14        d.   Digital device users can also attempt to conceal data by

15   using encryption, steganography, or by using misleading filenames and

16   extensions.  Digital devices may also contain "booby traps" that

17   destroy or alter data if certain procedures are not scrupulously

18   followed.  Law enforcement continuously develops and acquires new

19   methods of decryption, even for devices or data that cannot currently

20   be decrypted.

21        69.  Based on my training, experience, and information from

22   those involved in the forensic examination of digital devices, I know

23   that it is not always possible to search devices for data during a

24   search of the premises for a number of reasons, including the

25   following:

26        a.   Digital data are particularly vulnerable to inadvertent or

27   intentional modification or destruction.  Thus, often a controlled

28

environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

a)    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

70.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b)    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been

34

restarted or inactive, has not been unlocked for a certain period of
time (often 48 hours or less), or after a certain number of
unsuccessful unlock attempts.  Thus, the opportunity to use a
biometric unlock function even on an enabled device may exist for
only a short time.  I do not know the passcodes of the devices likely
to be found in the search.

c)  In my training and experience, the person who is in
possession of a device or has the device among his or her belongings
at the time the device is found is likely a user of the device.
However, in my training and experience, that person may not be the
only user of the device whose physical characteristics are among
those that will unlock the device via biometric features, and it is
also possible that the person in whose possession the device is found
is not actually a user of that device at all.  Furthermore, in my
training and experience, I know that in some cases it may not be
possible to know with certainty who is the user of a given device,
such as if the device is found in a common area of a premises without
any identifying information on the exterior of the device.  Thus, if
while executing the warrant, law enforcement personnel encounter a
digital device within the scope of the warrant that may be unlocked
using one of the aforementioned biometric features, the warrant I am
applying for would permit law enforcement personnel to, with respect
to every person who is located at the TARGET PREMISES during the
execution of the search who is reasonably believed by law enforcement
to be a user of a biometric sensor-enabled device that falls within
the scope of the warrant: (1) depress the person's thumb- and/or
fingers on the device(s); and (2) hold the device(s) in front of the

1   face of the person with his or her eyes open to activate the facial-,

2   iris-, and/or retina-recognition feature.

3       d)   In my training and experience, Romanian TCO members often

4   reside together to better coordinate their efforts.  This is

5   especially true for persons involved in fraud crimes as these crimes

6   often require specialized tools and equipment to create fraudulent

7   identification documents and the like.

8       71.  Other than what has been described herein, to my knowledge,

9   the United States has not attempted to obtain this data by other

10  means.

11                        XI.  **CONCLUSION**

12      72.  Based upon the foregoing facts and my training and

13  experience, I believe there is probable cause to believe that

14  evidence of conspiracy to commit mail, wire, and bank fraud, money

15  laundering, and passport fraud listed in Attachment B will be found

16  at the **SUBJECT RESIDENCE** and the **SUBJECT VEHICLE.**

17  Attested to by the applicant in
    accordance with the requirements
18  of Fed. R. Crim. P. 4.1 by
    telephone on this __27__ day of
19  November, 2024.

20

21

22  _____
    UNITED STATES MAGISTRATE JUDGE
23

24

25

26

27

28

                         36